IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2014

## MARK L. PECK v. STATE OF TENNESSEE and DISTRICT ATTORNEY GENERAL H. GREELEY WELLS, JR., ex officio

**Appeal from the Criminal Court for Sullivan County**
**No. 23069      Robert E. Cupp, Judge**

_____

**No. E2013-01760-CCA-R3-ECN - Filed July 28, 2014**

_____

The petitioner, Mark L. Peck, appeals the denial of his petition for writ of error coram nobis, arguing that newly discovered evidence of the unreliability of an FBI agent's firearms testimony entitles him to a new trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Mark L. Peck, Pro Se (on appeal), and Andrew N. Hall, Wartburg, Tennessee (at hearing), for the appellant, Mark L. Peck.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Barry P. Staubus, District Attorney General; and H. Greeley Wells, Jr., Retired District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In April 1989, the petitioner was convicted by a Sullivan County jury of the first degree premeditated murder of his girlfriend's estranged husband, Jimmy Strickler, and sentenced to life imprisonment. See State v. Mark Peck, No. 958, 1991 WL 154534, at *1 (Tenn. Crim. App. Aug. 15, 1991), perm. app. denied (Tenn. Jan. 27, 1992). His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. Id. Our direct appeal opinion provides the following summary of the

evidence introduced at his trial:

The state presented its case primarily through circumstantial evidence. The [petitioner], who dated the victim's estranged wife, Donna Strickler, shared a residence with Robin Johnson and Jim Clark. He had arranged for Johnson to awaken him at about 10:00 P.M., February 5, 1988. Shortly thereafter, the [petitioner] left the house, driving either his black pickup truck or John Talbott's gray van. The van contained Clark's twelve gauge shotgun. The [petitioner] often drove that vehicle and had regular access to the weapon.

Earlier that evening, the victim had driven his sister, Debbie Fluharty, to an Italian restaurant where they joined other family members for dinner. The victim kept a .45 caliber pistol in his car. At about 8:00 P.M., he went into the Ramada Inn to meet his wife, Donna, and others for drinks. Three hours later, the victim left the motel and went home. At about the same time, Donna Strickler departed and went to the Tri-City Lounge.

The state's theory, based upon the circumstances established at trial, is that the [petitioner], armed with Clark's shotgun, entered the victim's house by the garage door at about 11:00 P.M; gained entry by the use of a duplicate key he had acquired from Sears earlier that day; and then waited in the bedroom. The victim apparently entered by a different door and began to walk the hallway leading to his bedroom. He was shot twice at close range. The perpetrator took the victim's pistol, a bullet-proof vest he found in the closet, and went out the same door he had entered. Thereafter, sometime between 11:30 P.M. and midnight, the [petitioner] met Donna Strickler and Mary Stallard at the Tri-City Lounge. He remained at the lounge until approximately 2:00 A.M. when he returned to his residence.

The next morning, the victim's body was discovered by a relative. The door to the garage was open. The house key that opened that door was not among the keys that the victim had with him, nor was it found in the house. The doctor who did the autopsy established the victim's time of death at shortly after 11:00 P.M.

On the morning following the shooting, the [petitioner] took his pickup truck to Lori Woodall's house. He gave Woodall a pistol holster containing unspent shotgun shells and asked her to hold them for him. He hid the victim's .45 caliber pistol in a bedroom closet at Woodall's house. A few days later the [petitioner] asked another friend, Victoria Toney, to get the pistol and

clip. He did not mention that to Woodall. Thereafter, he directed Robin Johnson to take the keys to his truck to Woodall. The [petitioner] said he was going away for a couple of days. The state proved that Woodall, Toney, and Michele Akers, acting individually or in concert, disposed of the [petitioner's] truck, the shotgun shells, and the victim's gun. They took the [petitioner's] truck to Virginia and hid the victim's pistol in a pot-bellied stove; they threw the shotgun shells into a field near Woodall's house. All of these items were recovered by authorities. The victim's bullet-proof vest was found in the [petitioner's] shared residence.

Id. at *2-3.

One of the issues the petitioner raised on direct appeal was whether the testimony of an FBI agent who was an expert in firearms identification should have been excluded because he did not provide a probability percentage that the shotgun pellets found in the field behind Woodall's house were consistent with those found in the victim's body. Our direct appeal opinion contains our analysis of that issue:

The [petitioner] claims that the expert testimony of FBI Agent Peele should have been excluded because he failed to give a probability percentage that the shotgun "pellets came from the same shell or box of shells." The [petitioner] argues that the agent was testifying in terms of mere possibilities. The same objection is raised in regard to the testimony of Agent Crum.

Agent Peele, an expert in the area of firearms identification, explained how he analyzed the pellets and gave the basis for his opinion that the pellets found in the victim and those taken from the shells the [petitioner] disposed of were typical of pellets coming from the same shell or box. Agent Crum gave probative opinion evidence as to the composition of shot shells.

The admissibility of expert testimony is largely a matter of discretion for the trial judge. Baggett v. State, 220 Tenn. 592, 598, 421 S.W.2d 629, 632 (1967). Specific margins of error are not necessarily required. We find no abuse of discretion here.

Id. at *10.

On January 10, 1995, the petitioner filed a petition for writ of habeas corpus, which the court construed as a petition for post-conviction relief. Following the appointment of counsel and an evidentiary hearing, the post-conviction court denied the petition. This court

affirmed the judgment of the post-conviction court, and our supreme court denied the petitioner's application for permission to appeal. See Mark L. Peck v. State, No. 03C01-9611-CR-00402, 1998 WL 148292, at \*1 (Tenn. Crim. App. Mar. 31, 1998), perm. app. denied (Tenn. Feb. 16, 1999).

On May 5, 2009, the petitioner filed a petition for writ of error coram nobis, alleging newly discovered evidence that would have resulted in a different outcome in his trial had it been available at the time of trial. Specifically, he cited a May 8, 2008 letter, with accompanying attachments, that he had received from the district attorney. In the letter, the district attorney informed him that he had received a letter from the FBI dated April 24, 2008, stating that the testimony of FBI Agent Peele, which "stated or implied that evidentiary specimen(s) could be associated to a single box of ammunition, was unreliable and exceeded the limits of the science."

On April 27, 2012, the trial court held a hearing on the petition at which counsel made arguments and introduced as exhibits a number of different documents, including the transcript of the trial, the letters exchanged between the district attorney and the FBI, the letter from the district attorney to the petitioner, and the FBI laboratory report on the ballistics testing performed for the trial. The May 30, 2008 letter from the Acting Director of the FBI Laboratory to the Sullivan County District Attorney General states in pertinent part:

> This letter follows up on our previous communication regarding bullet lead analysis conducted by the FBI Laboratory. Thank you for providing the information requested from the above-referenced case.

> After reviewing the testimony of the FBI's examiner, it is the opinion of the Federal Bureau of Investigation Laboratory that the examiner stated or implied that the evidentiary specimen(s) could be associated to a single box of ammunition. This type of testimony exceeds the limits of the science and cannot be supported by the FBI.

On May 28, 2013, the trial court entered an order denying the petition on the grounds that the challenged testimony of Agent Peele was merely cumulative to other evidence and would not have resulted in a different judgment had it been excluded at trial. On July 31, 2013, the petitioner filed an untimely notice of appeal to this court. On August 12, 2013, this court entered an order waiving the timely notice of appeal requirement in the interest of justice.

-4-

## ANALYSIS

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We review this issue, therefore, under an abuse of discretion standard.

We find no abuse of discretion in the trial court's ruling. Agent Peele's confusing and arcane testimony, which comprises only a short portion of the voluminous trial transcript, was, essentially, that the composition analysis of samples of the shotgun pellets recovered from the victim, the field, and the shotgun showed that the shells were "typical" of having originated from the same box, or, if not from the same box, from a box in which the shells were of the same type and manufacture and "packaged on or about the same date." During an effective cross-examination, defense counsel was successful in showing the gaps in Agent Peele's knowledge of the Winchester manufacturing process. Defense counsel was also successful in getting Agent Peele to concede that he was unable to say whether it was "more likely than not" that the pellets from the victim's body and the pellets from the shotgun and the field came from the same box of shotgun shells. We agree with the trial court that there was ample circumstantial evidence of the petitioner's guilt, completely apart from Agent Peele's testimony, and, thus, no reasonable basis for concluding that the result of the proceeding might have been different were it not for Agent Peele's testimony.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court denying the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE